**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CAMERON E. WALLACE,

        Plaintiff,

v.                                    **Case No.  8:04-cv-115-T-23TBM**

DM CUSTOMS, INC., et al.,[1]

        Defendants.

_____/

## REPORT AND RECOMMENDATION

    THIS MATTER is before the court on referral by the Honorable Steven D. Merryday

for a Report and Recommendation on **Defendants' Motion for Summary Judgment** (Doc.

14) and **Defendants' Supplemental Motion for Summary Judgment** (Doc. 40). By their

motions, Defendants seeks an Order granting summary judgment on Plaintiff's claims for race

discrimination, harassment, and retaliation, brought pursuant to Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §2000e-2, et seq., the Florida Civil Rights Act of 1992, § 760.01,

Florida Statutes, et seq., and 42 U.S.C. § 1981, and for a hate crime, brought pursuant to

§ 775.085, Florida Statutes.[2]  Plaintiff filed responses in opposition (Docs. 17, 41).  The

---

[1]This action was initially brought against DM Customs, Inc., and William S. Boozer. Truck Depot of Holiday, Inc., and Truck Depot of Clearwater, Inc., were joined as party defendants in May and July 2006, respectively.

[2]More particularly, Defendants urge that summary judgment is warranted on each claim because Plaintiff is unable to demonstrate (1) a hostile work environment because the alleged harassment was not sufficiently severe and pervasive, (2) disparate treatment because he did not identify any similarly situated employees, (3) retaliation because he failed to establish a constructive discharge and a causal connection between the alleged constructive discharge and the filing of his EEO complaint, (4) discriminatory intent on the part of Boozer,

parties have filed affidavits, excerpts of depositions, declarations, and other documentary evidence in support of their positions.[3]  See (Docs. 15-16, 19, 29, 32).  A hearing on this matter was conducted on August 8, 2006.

I.

By his Third Amended Complaint, Plaintiff alleges five grounds for relief.  They are:

(1)     Count I - unlawful discrimination and harassment as against DM Customs, TDH, and TDC under FCRA, Title VII, and 42 U.S.C. § 1981;

(2)     Count II - unlawful retaliation as against DM Customs, TDH, and TDC under the FCRA, Title VII and 42 U.S.C. § 1981;

(3)     Count III - unlawful discrimination and harassment as against Boozer under 42 U.S.C. § 1981;

_____

(5) a violation of § 775.885 or that he was coerced, intimidated or threatened as a result thereof, and (6) evidence sufficient to establish he is entitled to damages in the form of back pay.  (Doc. 14).  By their supplemental motion, Defendants urge that Plaintiff's claims in Counts I and II as against TDH (and presumably TDC) fail because Plaintiff cannot establish that either business is an "employer" as defined by Title VII.  (Doc. 40).  By Defendants' reading, this defect deprives the court of subject matter jurisdiction over the claims against those entities.  Id. at 4.

[3]Also before the court is **Defendants' Motion to Strike Portions of Plaintiff's Evidence in Opposition to Summary Judgment** (Doc. 24) and Plaintiff's response (Doc. 27).  By this motion, Defendants urge that the court should not consider the administrative files of the Pinellas County Office of Human Rights and an investigative report documenting a telephone interview of witness Dave Soto.  The motion to strike (Doc. 24) is **GRANTED in part** and **DENIED in part**.  As it relates to Plaintiff's charges, the agency's findings of reasonable cause, and the agency's investigative reports documenting interviews with Soto and Plaintiff, the motion is denied.  The charges and findings of cause are admissible as business records under Fed. R. Evid. 803(8)(c), and arguably the interview notes are as well.  See Barfield v. Orange County, 911 F.2d 644, 650-51 (11th Cir. 1990).  In any event, there is no reason presented to doubt the veracity of the statements Plaintiff and Soto made to the EEO investigator, and their testimony is capable of being reduced to admissible form at trial.  Thus, these portions of the administrative files are considered on the instant motions.  In all other aspects, the motion to strike (Doc. 24) is granted.  My conclusions in no way suggest that the investigative file or parts of it should be admitted at trial.

(4)     Count IV - unlawful retaliation as against Boozer under 42 U.S.C. § 1981; and

(5)     Count V - hate crime as against DM Customs, TDH, and TDC under Fla. Stat. § 775.085.

(Doc. 43).  Plaintiff seeks back pay, front pay, compensatory damages, treble damages, punitive damages, pre and post-judgment interest, reasonable costs and attorney's fees, and injunctive relief.

The undisputed facts[4] in support of these claims establish that DM Customs, Inc., (hereinafter "DM Customs") was a Florida corporation located in Pinellas County, Florida. DM Customs' business involved customizing vehicles, primarily trucks, vans, and SUVs. William S. Boozer (hereinafter "Boozer") was the owner and manager of DM Customs. Boozer Dep. I (Doc. 32-2 at 24, 31).[5]  Plaintiff, an African-American male, began working for DM Customs as a detailer/painter helper on March 18, 2002.  At the time, he was the only African-American employee working for DM Customs.

On September 14, 2004, DM Customs and Boozer opened a new location in Holiday, Florida.  Boozer Dep. I (Doc. 32-2 at 25, 84-85).  It was then called DMC Truck Depot and operated as part of DM Customs.  Id. at 25-26.  The entity later became incorporated as Truck Depot of Holiday, Inc., (hereinafter "TDH"), and it was added as a party Defendant on May 23, 2006.  See (Docs. 36-37).  Boozer subsequently closed DM Customs and he sold the building and the property on which it was located.  Boozer Dep. II (Doc. 32-7 at 20).  He used a large portion of the proceeds from that sale to purchase a building in Clearwater.  This

---

[4]Although the parties provide vastly different descriptions and characterizations of pertinent events, they do not appear to dispute the basic chronology of events.

[5]Boozer was deposed twice.  His June 3, 2005, deposition is referred to herein as "Boozer Dep. I."  His February 9, 2006, deposition is referred to herein as "Boozer Dep II."

building became the location for "Truck Depot of Clearwater" (hereinafter "TDC").  TDC was added as a party Defendant on July 17, 2006.[6]  <u>See</u> (Docs. 42-43).  These companies are referred to collectively herein as "DM Customs" or the "Defendant companies."

Virtually all the remaining salient facts are disputed.  By Plaintiff's testimony, the first instance of racial harassment occurred when shop foreman David Sparks (hereinafter "Sparks") referred to him as "our nigger."  Wallace Dep.  (Doc. 19-10 at 44-45).  After that, Sparks used that racial slur daily.  <u>Id.</u> at 46-47.  Sparks also told racial jokes, put his dirty hands in Plaintiff's food, and told another co-worker that he should "have busted that nigger in the back of the head with a hammer."  <u>Id.</u> at 68, 80-81, 105.  Others also harassed Plaintiff.  For example, another employee, Adam Chapman, (hereinafter "Chapman") introduced Plaintiff by stating that, "[i]f you need something buffed, this is our number one nigger."  <u>Id.</u> at 49.  On June 11, 2002, Chapman repeatedly made an obscene gesture at him and called him a "nigger."  <u>Id.</u> at 93.  According to Plaintiff, he never used racial slurs against Chapman (or anyone else).  <u>Id.</u> at 47.  Other employees, including Joey Crockenberg (hereinafter "Crockenberg") and Bart Hopkins (hereinafter "Hopkins"), also used racial slurs towards Plaintiff; they used the word "nigger" towards him on an ongoing basis.  <u>Id.</u> at 63, 75.  Chapman, Crockenberg, and Hopkins also told racial jokes, and while Plaintiff could not recall the specifics of the jokes, he did not find them funny.  <u>Id.</u> at 46, 68-69.  Plaintiff complained of the racial slurs and jokes to his supervisor, Donny Eggebrecht (hereinafter "Eggebrecht").  <u>Id.</u> at 44, 46, 49, 67, 105.  He told Eggebrecht that, "I'm tired of the 'nigger'

---

[6]Insofar as the Defendants seek to relitigate the issue of the successor liability of TDH or TDC on this motion, I can find nothing new in their arguments and no reason to alter the conclusions I reached in granting the motions to amend the complaint to permit their additions as party defendants.  Rather than restate my analysis and conclusions on this report and recommendation, I simply adopt and incorporate the same herein.

jokes and why do I have to be 'nigger' this and 'nigger' that." Id. at 67.  According to

Plaintiff, he told Eggebrecht every time he was called "nigger," and Eggebrecht told Plaintiff

that he would handle it.  Id. at 44, 46, 88.  He also complained to Boozer on at least two

occasions.[7]  Id. at 98-100, 104.

Dave Soto (hereinafter "Soto"), another DM Customs employee, reported that

Plaintiff received adverse treatment "from day one."[8]  Id.  By his account, Plaintiff was subject

to "black jokes" on a daily basis, three to four times a day, and the word "nigger" was used.

---

[7]Plaintiff's affidavit, stamp- received by the Office of Human Rights on August 22, 2003, was more specific.  Plaintiff reported the following:  (1) 4/25/02 - while at McDonald's for lunch, an employee named "Rocky" talked about how "all black people should stay with their race; (2) 4/29/02 - Hopkins said to Plaintiff, "yo!  My nigger come here;" (3) 5/1/02 - after Hopkins knocked Plaintiff's buffer over and Plaintiff told him it cost $300, Hopkins stated, "nigger I am not paying for nothing;" (4) 5/24/02 - Hopkins told Plaintiff that he was "not going to do a 'nigger' job," which he defined as a job that "a white man does not do because it's dirty and 'niggers' are always dirty;" (5) 6/4/02 - Chapman said to Plaintiff, "what the hell are you laughing at nigger, black people always smell and always have grease all over the place wherever they lay their heads down;" (6) 6/5/02 - Crockenberg asked Plaintiff "if all black men had a big dick," and then told him to "take [his] dick out so they can hit it;" (7) 6/11/02 - Hopkins told Plaintiff he did not know why they gave him a job because "you can't read or write.  Most black people that are hired here don't last long;" (8) 6/11/02 - Chapman said to Plaintiff, "nigger why you fuckin with me;" (9) 7/8/02 - after Plaintiff told Sparks he had not seen whatever it was Sparks was looking for, Sparks called him a "lying black mother fucker," and stated," nigger you know where that mother fuckin' thing is;" (10) 7/8/02 - Chapman introduced Plaintiff as "their black nigger," (11) 7/31/02 - Sparks always called him "gravy," which meant that he did not do much, and he also said the only reason Plaintiff was there was that he a minority and Boozer needed a tax break; (12) 7/31/02 - Sparks stuck his dirty hands in Plaintiff's food and Plaintiff told Boozer that the black jokes and "nigger stuff" had to stop; (13) 8/1/02 - the next day, Plaintiff told others he should have kicked Sparks' ass but his family case first, Sparks overheard and told Boozer who told Plaintiff he could not threaten employees, and Plaintiff complained to Boozer that Boozer had not addressed the "nigger calling or black joke;" (14) 8/2/02 - Plaintiff heard Sparks tell Crockenberg that he "should of bust that nigger in the back of the head with a hammer . . ." (Doc. 19-13 at 4-9).

[8]On December 23, 2002, Equal Opportunity Coordinator Carol Tresca (hereinafter "Tresca") interviewed Soto by telephone.  See (Doc. 19-17).  Her report documenting the interview is the so-called Soto statement to which the parties refer.

Id.  Soto indicated that Plaintiff had complained about this to Eggebrecht, but nothing was ever done about it.  Id. at 2.

By Boozer's testimony, he was aware of only one occasion in which racial slurs were used, and it involved Plaintiff and Chapman making racial slurs at each other.  Boozer Dep. I (Doc. 32-2 at 52-53).  Plaintiff and Chapman told him they were joking, and but he told them it was unacceptable and would not be tolerated.  Id. at 53.  Boozer did not document the incident.  Id.  Boozer never witnessed any employee call Plaintiff a racial name and no one, including Eggebrecht and Hanson, ever reported to him that racial comments had been made to Plaintiff.  Id. at 53-54.  Boozer never heard any of his employees use the word "nigger," and he never used that word to refer to any of his employees.  Id. at 78.  Regarding the incident between Plaintiff and Sparks, Boozer was told that Plaintiff physically threatened Sparks after Sparks took french fries off of Plaintiff's plate.  Id. at 54.  Boozer never did not document that incident but he spoke to Plaintiff about it; Plaintiff did not tell him that Sparks had been making "nigger" jokes.  Id. at 55.  Boozer admits that DM Customs did not have a written policy prohibiting harassment and discrimination and it did not provide any training to its employees on the same.  Id. at 19.

As for his claim for disparate treatment,[9] Plaintiff alleges that he was not able to obtain health insurance although it was available to white employees, and whenever he asked about it, he was told that they were in the process of switching insurance companies.  Wallace Dep. (Doc. 19-10 at 39); (Doc. 19-11 at 8).  Defendants deny this claim.

_____

[9]Plaintiff's Third Amended Complaint generally alleges, "[u]pon information and belief, Wallace received less compensation and benefits than similarly situated non African American employees of Defendants."  (Doc. 43 at ¶ 19).  At arguments, Plaintiff's counsel conceded that the facts on this allegations are not well- developed.  As discussed below, Plaintiff allegations are inadequate to withstand this motion.

Plaintiff filed a charge of discrimination against DM Customs with the Pinellas County Office of Human Rights (hereinafter "Pinellas OHR") and EEOC on October 2, 2002. (Doc. 32-3).  The written charge listed August 2, 2002, as the "date most recent or continuing discrimination took place."  Id.  It appears that DM Customs received notice of Plaintiff's charge of discrimination on or about October 9, 2002.

By Plaintiff's account, after Boozer received notice of his charge, his assigned work area within the building was changed to the area in which Able Body (a company that had previously rented garage space from DM Customs) had worked.[10]  Wallace Dep. (Doc. 19-10 at 118-20).  Boozer's Jeep was also located in that area.  Before beginning his work, Plaintiff got "brand new" plastic to cover Boozer's Jeep so that it would not get covered with compound dust from his buffing.  When he went to cover the Jeep, Plaintiff saw the hangman's noose hanging on the vehicle.  Id. at 121-22.  He then called his wife, who told him to stay there.  Id. at 122-23.  Oliver Melvin (hereinafter "Melvin"), a compliance manager for the Pinellas OHR, arrived at DM Customs shortly thereafter and photographed the noose. Id. at 123.  The noose was removed.  Plaintiff does not know who placed the noose on the vehicle.  Melvin left.  According to Plaintiff, Boozer did not speak to him at all after Melvin left.  Id. at 127.  Plaintiff had not reported the noose to Boozer prior to Melvin arriving at DM Customs.  Plaintiff stayed awhile, left for lunch, and when he returned from lunch, he resigned.  According to Plaintiff, he resigned because he was concerned for his safety.

---

[10]Plaintiff's counsel urged at the hearing that Boozer was the one that reassigned Plaintiff to the new work area shortly after receiving Plaintiff's charge of discrimination. However, Plaintiff's deposition testimony does not reveal who it was that changed his work area assignment.  See Wallace Dep. (19-10 at 118-20).  Undercutting the assertion that it was Boozer are Tresca's investigative notes documenting a May 7, 2003, interview with Plaintiff, wherein he told her that he "was told by Donny [Eggebrecht] that he was to work in that area." See (Doc. 19-14 at 37).

Boozer does not dispute that he received notice of Plaintiff's charge of discrimination prior to the noose incident.  Boozer Dep. (Doc. 32-2 at 60-61).  By Boozer's account, he called Plaintiff to his office after he received notice of the charge and he asked Plaintiff why he did not say anything before filing the complaint.  Id. at 58-59.  According to Boozer, Plaintiff admitted that he had been offered health insurance during enrollment, but that he could not afford it.  Id. at 59.  Boozer testified that Plaintiff told him "this would all go away" if Boozer paid for his and his family's health insurance.  Id.  Boozer denied that Plaintiff mentioned anything about racial slurs and he did not recall asking Plaintiff about such or whether he spoke to Plaintiff's co-workers about the allegations.  Id. at 59, 64.

As for the noose incident, Boozer essentially denied any knowledge of, or responsibility for, it being in his Jeep.  He believed the noose had been belonged to Brian Hubbard (hereinafter "Hubbard"), an employee of Able Body.  Hubbard had a Scooby-Doo doll with a rope around its neck that he kept in his desk.  Id. at 61-65; Hubbard Decl. (Doc. 19-2).  Boozer did not think the rope looked like a noose.  Boozer Dep. I (Doc. 32-2 at 61, 67).  Boozer previously had seen the Scooby-Doo doll on Hubbard's desk, but the first time he saw it hanging from the roll bar on his Jeep was when Melvin came to DM Customs and demanded to see Plaintiff.  Id. at 65, 70.  Boozer testified that his Jeep must have been covered for quite awhile because the plastic covering was filthy and Melvin and Plaintiff had to remove it so that he could see the Scooby-Doo doll hanging from the noose.  Id. at 71-73.  According to Boozer, the noose around the doll's neck was the same as the one that he had seen on Hubbard's work area.  Id.  66-67.  Boozer admitted that the area in which his Jeep was located was not the area in which Plaintiff normally worked, and he indicated that if Plaintiff had been recently assigned to work in that area, Eggebrecht would have been the one to make the assignment.  Id. at 72.  Boozer did not recall who removed the noose, but someone did.

<u>Id.</u> at 74-75.  Boozer does not know who hung the noose with the Scooby-Doo doll on his Jeep.  <u>Id.</u> at 70.

According to Hubbard, one of his co-workers put a noose around his Scooby-Doo doll's neck in March 2002, but the noose was removed one month later.  Hubbard Decl. (Doc. 19-2).  Hubbard indicated that the noose/rope that had been around his doll's neck was not the same as the noose/rope that was in the photograph taken by Melvin.  <u>Id.</u>  Hubbard and the other Able Body employee were no longer working out of space at DM Customs at the time of the noose incident.  Wallace Dep. (Doc. 19-10 at 133).

Plaintiff filed a second charge of discrimination on January 28, 2003.  (Doc. 19-11 at 9).  By that charge, Plaintiff alleged that he was retaliated against by DM Customs and Boozer for filing the charge of discrimination because, after DM Customs and Boozer received the charge, "my employer placed a hangman's noose in my work area to harass, intimidate and threaten me in retaliation for my having filed the charge."  <u>Id.</u>  Plaintiff alleged this resulted in his constructive discharge because he had to resign out of fear for his personal safety.  <u>Id.</u>

On July 23, 2003, Melvin issued a Determination of Reasonable Cause with regards to Plaintiff's charge of discrimination and harassment, concluding that, after a full investigation, the Pinellas OHR determined that there was reasonable cause to believe that DM Customs and/or Boozer had engaged in an unlawful employment discrimination on the basis of race, in violation of federal and county laws.  (Doc. 19-11 at 10).  Melvin issued a similar determination the same day regarding Plaintiff's complaint of retaliatory treatment.  <u>Id.</u> at 14.

II.

The court shall grant summary judgment for the moving party only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court may look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," in determining whether summary judgment is appropriate. Fed. R. Civ. P. 56(c). The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. See Celotex, 477 U.S. at 324; Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994). The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception. See Perkins v. Sch. Bd. of Pinellas County, 902 F. Supp. 1503 (M.D. Fla. 1995). It must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e).

When deciding a motion for summary judgment, "[i]t is not part of the court's function . . . to decide issues of material fact, but rather determine whether such issues exist to be tried . . ." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations." Hairston, 9 F.3d at 919 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)). The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. See id. at 921; see also Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997). All the

10

evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997).

III.

A.

By Count I, Plaintiff alleges that he was subjected to a racially hostile workplace at DM Customs at the hands of his supervisor and fellow employees who repeatedly referred to him as a "nigger" and repeatedly told racial jokes or abused him because he was an African American.  In Count III, the Plaintiff asserts the same claim as against Boozer on the theory that he knowingly failed to act to stop the discrimination.[11]

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[12]  42

---

[11]As noted above, Plaintiff alleged generally that Defendants engaged in disparate treatment by not allowing him the same access to health insurance as were white employees of DM Customs.  The allegations of disparate treatment are challenged on this motion because Plaintiff is unable to show that he was treated differently from any other employee.  At oral arguments, Plaintiff's counsel conceded that he had not been able to develop the claim factually.  Because the Plaintiff makes no showing adequate to support a separate claim for disparate treatment, the motion should be granted.  These allegations and any supporting facts are considered insofar as they may support the claims of hostile work environment.

[12]Both Title VII and § 1981 hostile work environment claims have the same requirements of proof and use the same analytical framework.  Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002).  Plaintiff's FCRA claims also are appropriately analyzed under Title VII jurisprudence.  Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1109 n.4 (11th Cir. 2001) (quoting Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998)); Fla. Dep't of Cmty. Affairs v. Bryant, 586 So. 2d 1205, 1209 (Fla. Dist. Ct. App. 1991).

U.S.C. § 2000e-2(a)(1).  To establish a hostile work environment claim, Plaintiff must show that: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment complained of was based on his race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment so as to create an abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or of direct liability.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275-76 (11th Cir. 2002).

Here, Defendants do not dispute that Plaintiff belongs to a protected group (African-Americans), or that the offensive comments were based on his race and were unwelcome. Rather, Defendants argue that Plaintiff failed to demonstrate that the alleged harassment was sufficiently severe or pervasive so as to alter the terms of his employment.  By Defendants' review of the evidence, Plaintiff has identified, at most, [only] eight to ten incidents in a seven-month period and they were not such so as to rise to the level of being "severe." Defendants also argue that Plaintiff failed to establish that Boozer participated in or was aware of any harassment of Plaintiff.

As indicated above, the racially harassing conduct "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"[13] Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (sexual harassment case) (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). Harassment is severe or pervasive for Title VII purposes only if it is both subjectively and

---

[13]An abusive work environment is one in which "the work place is permeated with 'discriminatory intimidation, ridicule, and insult.'"  Harris, 510 U.S. at 21 (quoting Meritor, 477 U.S. at 65).

objectively severe and pervasive.  Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir.

1999).  Harassment is subjectively severe and pervasive if the plaintiff perceived it to be so at

the time, and is objectively severe and pervasive if a reasonable person in the plaintiff's

position would find the environment hostile or abusive.  Hulsey v. Pride Restaurants, LLC,

367 F.3d 1238, 1247-48 (11th Cir. 2004); Mendoza, 195 F.3d at 1246.  When determining the

objective component, courts typically look to the frequency and severity of the

conduct; whether the conduct is physically threatening or humiliating, or a mere offensive

utterance; and whether the conduct unreasonably interferes with the plaintiff's job

performance.  Hulsey, 367 F.3d at 1247-48; Mendoza, 195 F.3d at 1246.  A totality of the

circumstances approach is employed when considering these factors; proof of each factor

individually is not required.  Hulsey, 367 F.3d at 1248 (citing Miller, 277 F.3d at 1276).

Upon consideration, Plaintiff has demonstrated that he perceived the harassment to

be severe and pervasive at the time it occurred.  Beyond Plaintiff's own testimony, Soto's

statement also demonstrates that Plaintiff perceived the harassment to be severe and

pervasive.  Further, Defendants do not seriously dispute that Plaintiff subjectively perceived

the work environment as hostile and abusive, and to the extent that they do by way of

Boozer's testimony or outright denial of the facts, a genuine issue of material fact exists with

respect to this element.

While Plaintiff's evidence is less than abundant with respect to the objective

component, I conclude that when Plaintiff's allegations are accepted as true, the conduct he

complained of was not altogether infrequent and, while the severity of the alleged incidents

viewed individually may not appear to be sufficiently harassing, they are severe or pervasive

when viewed as a whole, under the totality of the circumstances.  Further, while the allegedly

13

harassing conduct may not have been physically threatening, it is not unreasonable to infer that the overall atmosphere of DM customs was racially demeaning and hostile.  Here, Plaintiff's testimony supports his allegation that the conduct interfered with his job performance and Defendants do not seriously demonstrate the contrary.

Plaintiff must also establish a basis for holding DM Customs and Boozer liable.  An employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  The employer is strictly liable for the hostile environment if the supervisor takes tangible employment action against the victim.  See id. at 807.  However, when an employee has established a claim for vicarious liability but where no tangible employment action was taken, a defending employer may raise as an affirmative defense to liability or damages: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807.  Where the perpetrator of the harassment is merely a co-worker of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action.  See Miller, 277 F.3d at 1278; Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000).

To establish a claim for individual liability under § 1981, a plaintiff must demonstrate "some affirmative link to causally connect the actor with the discriminatory

action."[14]  Allen v. Dnever Pub. Sch. Bd., 928 F.2d 978, 983 (10th Cir. 1991), overruled on

other grounds, Kendrick v. Penske Transp. Servs., Inc., 220 F.2d 1220, 1228 (10th Cir. 2000);

see also Patterson v. County of Oneida, N.Y., 375 F.3d 206, 229 (2d Cir. 2004) (quoting

Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000)).  The claim must

be "predicated on the actor's personal involvement."  Allen, 928 F.2d at 983.  Personal

involvement may be satisfied by proof that the individual had knowledge of the alleged acts of

discrimination and failed to remedy or prevent them.  See Patterson, 375 F.3d at 229; Amin v.

Quad/Graphics, Inc., 929 F. Supp. 73, 78 (N.D. N.Y. 1996); Figures v. Bd. of Pub. Utilities of

Kansas City, Kan., 731 F. Supp. 1479, 1483 (D. Kan. 1990).  Negligence in maintaining an

anti-discrimination policy does not constitute the "personal involvement" or "affirmative link"

required.  Whidbee, 223 F.3d at 75.

Here, Plaintiff maintains that the hostility was so severe that he ultimately was

constructively discharged from his position.  While Boozer maintains that he was either

unaware of the occurrences or suggests that he and the company took reasonable steps to

correct the harassing behavior, I find the facts in this regard nearly entirely disputed.  Further,

in a light most favorable to the Plaintiff, he was harassed by the shop foreman (Sparks) and

fellow employees, and when he complained to his direct supervisor (Eggebrecht) and Boozer

about the harassment, they took no remedial action.  This was a small company over which

Boozer appears to have maintained complete control.  In a light favorable to Plaintiff, if the

racially hostile environment existed as he contends, it did so because Boozer condoned it and

permitted it to go on.  Thus, I find the proffered evidence adequate at this stage of the

---

[14]The parties do not cite controlling authority on this particular point.  My research on
this issue has likewise failed to reveal Eleventh Circuit authority on point.

proceedings to hold both DM Customs and Boozer liable on the theory of hostile work environment discrimination as alleged in Counts I and III.[15]  See Miller, 277 F.3d at 1278; Breda, 222 F.3d at 889 (Title VII cases); Patterson, 375 F.3d at 229 (§ 1981 context).

B.

By Counts II and IV, Plaintiff alleges that DM Customs and Boozer, respectively, retaliated against him for filing the EEO complaint as evidenced by the placing of a noose on Boozer's Jeep and his resultant constructive discharge.  To establish a prima facie case of retaliation under Title VII, Plaintiff must show (1) that he engaged in statutorily protected expression,[16] (2) he suffered an adverse employment action, and (3) the adverse employment action was causally related to his protected activities.  42 U.S.C. § 2000e-3(a); Stavropoulos v. Firestone, 361 F.3d 610, 616 (11th Cir. 2004); Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1180 (11th Cir. 2003); Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).[17]  If the plaintiff establishes a prima facie case of retaliation, the

---

[15]In urging that Boozer is not individually liable, Defendants cite to Collier v. Clayton County Cmty. Serv. Bd., 236 F. Supp. 2d 1345 (N.D. Ga. 2002); Whidbee; and Allen.  See (Doc. 40 at 5).  These cases do not support a contrary result.  In Collier, the plaintiff's § 1981 claim was merged into her § 1983 claim and thus § 1981's individual liability requirement was not addressed.  Whidbee and Allen are factually distinguishable in that neither involved allegations of an owner/supervisor turning a blind eye to harassing conduct of his workers.

[16]Protected expression involves opposing an employment practice made unlawful under Title VII.  42 U.S.C. § 2000e-3(a).  "Statutorily protected expression" includes internal complaints of harassment to superiors, as well as complaints filed with the EEOC.  Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001).

[17]The FCRA is patterned after Title VII, and thus, Plaintiff's FCRA claims are appropriately analyzed under Title VII jurisprudence. Bass, 256 F.3d at 1109 n.4 (quoting Harper, 139 F.3d at 1387); Bryant, 586 So. 2d at 1209.  However, as the Eleventh Circuit has noted, it remains an "open question" in this Circuit as to whether the elements of Title VII and § 1981 retaliation claims are the same.  See Bass, 256 F.3d at 1120, n. 10.  The parties in this case make no differentiation aside from the individual liability under § 1981.

burden shifts to the defendant to articulate legitimate reasons for the adverse employment action.  Johnson, 234 F.3d at 507.  If the defendant does so, the plaintiff must demonstrate that the reasons the defendant gave were pretextual.  Id.

Defendants do not dispute that Plaintiff's complaints of race discrimination and harassment were statutorily protected expression.  Rather, Defendants argue that Plaintiff cannot establish that his resignation was a constructive discharge, and even if he could, he is unable to show any causal connection between the alleged constructive discharge and the filing of his EEO complaint.  In response, Plaintiff argues that the noose incident was the "final straw" supporting his constructive discharge, and he urges that the nearness in time between his complaint of discrimination and being ordered [by Boozer] to work in an area where a noose was hung from Boozer's vehicle is sufficient direct evidence of retaliation.

To prove constructive discharge, Plaintiff must demonstrate that he involuntarily resigned from DM Customs to escape intolerable and illegal employment requirements to which he was subjected because of race.  See Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993) (quoting Henson v. City of Dundee, 682 F.2d 897, 907 (11th Cir. 1982)); see also Pa. State Police v. Suters, 542 U.S. 129, 133 (2004) (holding that, to establish a constructive discharge claim, the plaintiff must show that the hostile working environment became so intolerable that his resignation qualified as a fitting response).  Thus, Plaintiff must show that his working conditions were so intolerable that a reasonable person in the same position would be compelled to resign.  See Kilgore v. Thompson & Brock Mgmt., 93 F.3d 752, 754 (11th Cir. 1996).  Further, an employee has the responsibility to act reasonably before choosing to resign, and then labeling that resignation as a constructive discharge.  See Garner v. Wal-Mart Stores, Inc.,807 F.2d 1536, 1539 (11th Cir. 1987).

17

I find this a very close issue.  I have already concluded that Plaintiff has demonstrated sufficiently severe and pervasive harassment to warrant a jury's consideration of the hostile work environment claims against the Defendants, and surely the placement of a noose in his workspace is further proof of the racially hostile work place.  In a light most favorable to the Plaintiff, he gave the Defendants adequate time to remedy the conditions and they failed to do so.  Even after making a formal complaint, the harassment continued.  In my view, the mere removal of the noose did not cure the hostility.  At this stage of the proceedings, I believe the facts when viewed in a light favorable to the Plaintiff are sufficient to raise a question of fact on the matter of Plaintiff's constructive discharge.

To establish a causal connection, the plaintiff must show that the decision makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated.  Bass, 256 F.3d at 1119; Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) ("The causal link element is construed broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'"); Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000).  Close temporal proximity between the protected activity and the adverse employment action may be sufficient to show that the two were not wholly unrelated.  Bass, 256 F.3d at 1119; Gupta, 212 F.3d at 590.  The plaintiff must at least establish that the employer was actually aware of the protected expression at the time it took adverse employment action against the plaintiff.  Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997).

Here, while the Plaintiff can establish a close temporal proximity between the filing of his formal complaint and his finding the noose and leaving the business, the evidence is otherwise thin that the noose was placed there in retaliation for his EEO complaint.  In a light

18

most favorable to Plaintiff, his evidence reveals that shortly after Boozer received his charge of discrimination and questioned him about it, he was assigned to a different work area. Although Plaintiff's counsel argued at the hearing that Boozer reassigned his work area, I can find nowhere where Plaintiff has testified to this and interview notes indicate that he told Tresca during an interview in 2003 that Eggebrecht was the one that assigned him to work in the new area.  There is no showing that Eggebrecht knew of the EEO complaint when he did this.  Although Plaintiff does not know who placed the noose, it was on Boozer's Jeep. While, he cannot say why it was placed there, his testimony is that it was not there previously,[18] i.e., before he filed his complaint, and, in light of the ongoing racial hostility in the workplace, all of which was directed at him, he surmises that the noose was placed there to intimidate him.

Beyond these circumstances, Plaintiff also suggests that inconsistencies in Boozer's testimony permit the inference that Boozer hung the noose on his Jeep to intimidate Plaintiff in retaliation for filing the charge of discrimination.  Thus, Plaintiff points to Boozer's testimony that the rope that formed the noose hanging from his Jeep was the same rope used to form a noose around Hubbard's Scooby-Doo doll, which is at odds with Hubbard's statement that the rope used to make the noose hanging from the Jeep was "thicker and larger than the rope that was around the doll's neck."  Compare Boozer Dep. I (Doc. 32-2 at 66-67) with Decl. Hubbard (Doc. 19-2).  Boozer also testified that the plastic covering over his Jeep was dirty and grimy, suggesting that it had been covered for a while, which is inconsistent

---

[18]While *working* in that particular area was new for Plaintiff, his testimony is that he walked by Boozer's Jeep "every single day" and had never seen the noose on it.  Wallace Dep. (Doc. 19-1 at 121).

with Plaintiff's testimony that he covered Boozer's Jeep with a new sheet of plastic so that it would not get covered with compound dust while buffing.  Compare Boozer Dep. I (Doc. 32-2 at 71-72) with Wallace Dep. (Doc. 19-2 at 122).  From this, Plaintiff seeks to cast doubt on the veracity of Boozer's testimony about the noose incident and to allow for an inference that Boozer is the one who hung the noose on his Jeep and he did so to intimidate Plaintiff in retaliation for filing a formal charge of discrimination.

Lastly, there is close temporal proximity between the protected activities and the adverse employment action.  On this motion, Plaintiff need only demonstrate that they were not wholly unrelated.  See Shannon v. Bellsouth Telecomm., Inc., 292 F.3d 712, 716-17 (11th Cir. 2002); Bass, 256 F.3d at 1119.  While the evidence is quite thin, I find that Plaintiff can arguably demonstrate a causal connection between adverse employment action taken against him by Defendants and his protected activities, and thus establish a prima facie case of retaliation.  In response, Defendants deny any retaliation, deny taking any adverse employment action against the Plaintiff, and claim that Plaintiff acted unreasonably and resigned despite the fact that Boozer responded appropriately by removing the noose.  In a light  most favorable to Plaintiff, the evidence submitted by the parties raises genuine issues of material fact as to whether Defendants' denials or reasons for it actions are pretext for retaliatory discrimination, precluding summary judgment as to Counts II and IV.

## C.

By Count V, Plaintiff alleges that the conduct of DM Customs with regards to the harassment and the noose constitutes a violation of Florida's hate crime statute.  Thus, Plaintiff alleges that by unlawfully allowing the harassment, including the placement of the noose on Boozer's vehicle, DM Customs intentionally threatened by word or by act to do

violence to Plaintiff, it had an ability to do so, and its conduct reasonably led Plaintiff to fear that such violence was imminent.

Florida's hate crime statute, which proscribes "bias-motivated crimes,"[19] provides for reclassifying of felony or misdemeanor crimes if the commission of such crime evidences prejudice based on race.  It further provides, in pertinent part:

> (2)  A person . . . that establishes by clear and convincing evidence that [he] has been coerced, intimidated, or threatened in violation of this section has a civil cause of action for treble damages, an injunction, or any other appropriate relief in law or in equity.  Upon prevailing in such civil action, the plaintiff   may recover reasonable attorney's fees and costs.

> (3)  It is an essential element of this section that the record reflect that the defendant perceived, knew, or had reasonable grounds to know or perceive that the victim was within the class delineated in this section.

Fla. Stat. § 775.085.  "The statute has three requirements: (1) The perpetrator must demonstrate prejudice, or bias; (2) the bias must be evidenced in the commission of a crime; and (3) the bias must be based on one or more of the enumerated characteristics of the victim. Stalder, 630 So.2d at 1074.  As that court has clarified, "the statute requires that it is the *commission of the crime* that must evidence the prejudice; the fact that racial prejudice may be exhibited during the commission of the crime is itself insufficient."  Id. at 1076-77 (citing Dobbins v. State, 605 So. 2d 922, 923 (Fla. Dist. Ct. App. 1992)).

Defendant argues on this motion that Plaintiff cannot establish a violation of § 775.085 by clear and convincing evidence, and even if he could, he cannot establish that he was coerced, intimidated or threatened as a result of the violation.  Plaintiff does not respond to

---

[19]The Florida Supreme Court has defined that term as "any crime wherein the perpetrator intentionally selects the victim because of the victim's 'race, . . .'"  State v. Stalder, 630 So. 2d 1072, 1077 (Fla. 1994).

21

Defendants' argument that the crime must be demonstrated by clear and convincing evidence and he is unable to identify any particular crime that was committed.  He does maintain that the course of conduct directed at him including the noose incident left him feeling threatened. While he argues that conduct may be viewed as a criminal violation of the federal civil rights statute at 18 U.S.C. §§ 241[20] or perhaps a misdemeanor violation of Florida statutes criminalizing stalking, breach of the peace/disorderly conduct, or assault, he makes no demonstration at all that the evidence satisfies the elements of any of these crimes.

Upon consideration, even in a light most favorable to the Plaintiff, his allegations and proffered evidence are insufficient to withstand the motion and summary judgment should be granted on this count.  Even if the racial name-calling and jokes, including someone's placement of a  noose in the workplace, left Plaintiff feeling threatened, there is no demonstration that such conduct was criminal and bore the necessary criminal animus or *mens rea* to support any crime.

## D.

Next, Defendants argue that in the event that liability is established, that Plaintiff should not be permitted to present any evidence of lost back pay because he has failed to provide computation of that pay as required by Fed. R. Civ. P. 26(a)(1)(C).  While Defendants have attempted to obtain information necessary to determine Plaintiff's lost wages, they complain that Plaintiff has produced no records and the records are not otherwise available.

---

[20]At arguments, Plaintiff cited United States v. Hobbs, Case Nos. 05-4744, 05-4745, 2006 WL 2038757 (4th Cir. July 19, 2006).  The case involved a criminal conspiracy by the defendants to drive an African American family from a town in violation of 18 U.S.C. § 241. Rather than supporting Plaintiff's position, a review of the facts introduced at the criminal prosecution of the defendants serves to demonstrates how woefully inadequate the Plaintiff's proffer of evidence is on this count.

In support, Defendants note that Plaintiff has testified that, while he went back to work full-time by the end of the year 2002, any documents related to that employment have been lost or destroyed and are no longer available, and none of this information available from a collateral source because Plaintiff did not file tax returns in 2002, 2003, or 2004.  Thus, Defendants urge that summary judgment should be granted on this claim for damages.  Plaintiff urges the court to deny Defendants' request, noting that they did not actively seek information from him regarding his back pay during discovery and are not prejudiced in this regard because they know the information necessary to make the calculations of his back pay.

While this is not an insignificant issue, I don't believe it should be addressed for the first time on this motion for summary judgment.  Defendants are not totally in the dark on this as they are in possession of the wage/pay information necessary to determine Plaintiff's back pay lost since his purported constructive discharge.  What they lack is evidence of income Plaintiff admittedly earned from other sources since his discharge.  While it may be correct that Plaintiff has no records of such income, he is duty bound to produce a computation of his damages and such documentary or other proof as may exist to support the claim.

Accordingly, on this claim, I *sua sponte* order that Plaintiff shall complete his disclosures as required under Rule 26(a)(1)(C) and set forth, with specificity, his computation of damages within <u>fifteen (15) days</u> of the date of this report and recommendation.  Should Plaintiff fail to do so, I recommend his claim for back pay should be stricken.  In the event Plaintiff provides such computation, the matter may be addressed on subsequent motion if necessary.

E.

By the Supplemental Motion for Summary Judgment (Doc. 40), Defendants argue that TDH and TDC lack the requisite number of employees to be considered an "employer" as defined under Title VII.[21]  Since only "employers" are subject to liability under Title VII, Defendants argue that Plaintiff is unable to demonstrate that the court has jurisdiction over these Defendants.  Relying on Clifton v. MARS Telecom, Inc., No. 95-2364-JWL, 1996 WL 157288 (D. Kan. Mar. 5, 1996) (unpublished), Defendants also argue that employees of DM Customs, where Plaintiff worked, cannot be counted as employees of either TDH or TDC to meet the threshold number, even under a theory of successor liability.[22]  (Doc. 40 at 3-4).

In response, Plaintiff argues that the number of persons employed by TDH [and TDC] is irrelevant because jurisdiction over them results from them being successors to DM Customs and it is undisputed that DM Customs employed the requisite number of employees for purposes of Title VII.  He also argues that Defendants' jurisdiction argument fails in light of the Supreme Court's recent decision in Arbaugh v. Y & H Corp., __ U.S. __, 126 S.Ct. 1235, 1239 (2006) (holding that the employee numerosity requirement for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue).  Lastly, Plaintiff urges that Defendants' reliance on Clifton is inapposite.  (Doc. 41 at 1-3).

---

[21]This motion was filed before TDC was added as a party defendant.  The court assumes that Defendants' argument above applies with equal force with regards to TDC.

[22]Defendants argue further in this motion that Plaintiff has failed to establish that Boozer has committed any act in violation of 42 U.S.C. § 1981.  By this argument, Plaintiff cannot establish that Boozer had any discriminatory intent or personal involvement in any of the racially discriminatory activities alleged.  These contentions have been considered in respect to each count and are not addressed further.

Under Title VII, it is an unlawful employment practice for an employer to discharge any individual because of such individual's race.  42 U.S.C. § 2000e-2(a)(1).  An employer is defined as "a person[23] engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . ."[24]  Id. § 2000e(b).  Thus, to establish a prima facie case under Title VII, a plaintiff is required to prove, among other things, that the defendant was his employer.  See Arbaugh, 126 S.Ct. At 1239.

Defendant is not entitled to summary on Counts I and II with respect to Defendants TRH and TRC.[25]  As indicated previously, in addressing the successor liability issue on the motions to amend, I found that the pertinent inquiry with regards to Title VII's numerosity requirement to be whether DM Customs met such, not whether TDH and TDC did, given that the facts of this case weighed in favor of imposing successor liability.[26]  That DM Customs meets the employee numerosity element is not disputed.  Defendants' reliance on Clifton to

---

[23]A person is defined to include corporations.  42 U.S.C. § 2000e(a).

[24]The current year as referenced in the statute is the year in which the alleged discrimination occurred.  Dumas v. Town of Mt. Vernon, 612 F.2d 974, 979, n. 4 (5th Cir. 1980).

[25]Plaintiff is correct that Title VII's numerosity requirement is not jurisdictional.  See Arbaugh, 126 S.Ct. At 1239.  Thus, dismissal for lack of jurisdiction as urged by Defendants is clearly inappropriate.

[26]The Orders (Docs. 36, 42) addressing successor liability are incorporated herein. Although the facts of this case do not involve a purchase of DM Customs' business from either TDH or TDC, a sale or the lack thereof is only one of the factors to which a court can look in determining whether to impose successor liability.  See Terco, Inc., v. Fed. Coal Mine Safety & Health Review Comm'n, 839 F.2d 236, 239 (6th Cir. 1987) (recognizing that the lack of a sale may actually indicate that the predecessor and successor corporations are so closely linked that arms length dealings as usually occur during a sale never occur and are not necessary).

support a contrary finding is unpersuasive.  In that case, the plaintiff did not allege that the first predecessor company discriminated against her; rather, she sought to have that company's employees counted for purposes of meeting the numerosity requirement for the successor corporation.  See Clifton, 1996 WL at 3.  The facts in that case undercut Defendants' argument.  Imposition of successor liability in Title VII cases is typically appropriate when the equities favor holding the successor corporation liable for the discriminatory acts of its predecessor, not vise versa.  Further, Clifton is unpublished and non-controlling authority.  Although the Eleventh Circuit has not squarely addressed this issue and my research has not revealed other instances in which this particular question was answered, the policy considerations underlying the application of successor liability in the Title VII context do.

IV.

Accordingly, it is RECOMMENDED that Defendants' Motion for Summary Judgment (Doc. 14) be **GRANTED in part** and **DENIED in part**.  I recommend that the court grant summary judgment on Plaintiff's claim of disparate treatment (Counts I and III) and of a hate crime (Count V).  In all other regards, I recommend that Defendants' Motion for Summary Judgment be denied.  It is also RECOMMENDED that Defendants' Supplemental Motion for Summary Judgment (Doc. 40) be **DENIED**.

Respectfully submitted on this
11th day of August 2006.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

**<u>NOTICE TO PARTIES</u>**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; <u>see also</u> Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
The Honorable Steven D. Merryday, United States District Judge
Counsel of Record